UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AARON MURPHY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ARGO BLOCKCHAIN PLC, PETER WALL, ALEX APPLETON, MATTHEW SHAW, SARAH GOW, COLLEEN SULLIVAN, and MARIA PERRELLA,<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Aaron Murphy ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Argo Blockchain plc ("Argo" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Argo American

Depository Shares ("ADSs") pursuant and/or traceable to the Offering Documents (defined below) issued in connection with the Company's initial public offering conducted on or about September 23, 2021 (the "IPO" or "Offering"); and/or (b) Argo securities between September 23, 2021 and October 10, 2022, both dates inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2. Argo, together with its subsidiaries, purports to engage in the cryptocurrency mining business worldwide, including the mining of Bitcoin or Bitcoin equivalents (together, "BTC").

3. Argo maintains a fleet of thousands of BTC mining machines at facilities located in Canada and Dickens County, Texas. The Company's Texas facility is referred to as its "Helios" facility.

4. On August 19, 2021, Argo filed a registration statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on September 22, 2021 (the "Registration Statement").

5. On September 23, 2021, Argo filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

6. On or about September 23, 2021, pursuant to the Offering Documents, Argo conducted the IPO, issuing 7.5 million ADSs to the public at the Offering price of $15 per ADS for approximate proceeds of $105 million to the Company before expenses and after applicable underwriting discounts and commissions.

7.     The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) Argo was highly susceptible to and/or suffered from significant capital constraints, electricity and other costs, and network difficulties; (ii) the foregoing issues hampered, *inter alia*, Argo's ability to mine BTC, execute its business strategy, meet its obligations, and operate its Helios facility; (iii) as a result, Argo's business was less sustainable than Defendants had led investors to believe; (iv) accordingly, Argo's business and financial prospects were overstated; and (v) as a result, the Offering Documents and Defendants' public statements throughout the Class Period were materially false and/or misleading and failed to state information required to be stated therein.

8.     On June 7, 2022, Argo issued a press release providing an operational update, in which it disclosed that it had mined approximately 25% fewer BTC in May 2022 compared to April 2022 because of, *inter alia*, increased network difficulty, higher electricity prices, and the curtailment of mining operations at its Helios facility.

9.     On this news, Argo's ADS price fell $0.28 per ADS, or 4.4%, to close at $6.09 per ADS on June 7, 2022.

10.    On October 7, 2022, Argo issued a press release "announc[ing] several strategic actions that are intended to bring in additional capital to the business and ensure that the Company has the working capital necessary to execute its current strategy and meet its obligations over the

next twelve months." Argo stated that in addition to measures being undertaken to reduce costs and preserve capital, the Company had signed a non-binding letter of intent with an affiliate of New York Digital Investment Group ("NYDIG") to amend an existing equipment financing agreement, plans to sell 3,400 mining machines for cash proceeds of £6 million, and intends to raise approximately £24 million via a proposed subscription with a strategic investor.

11.     On this news, Argo's ADS price fell $0.97 per ADS, or 23.26%, to close at $3.20 per ADS on October 7, 2022.

12.     Then, on October 11, 2022, Argo issued a press release providing an operational update, in which it announced that "[d]uring the month of September, Argo mined 215 [BTC] compared to 235 BTC in August 2022" which was "primarily due to a 12% increase in average network difficulty during September." Argo also stated that it "is continuing to curtail operations at its Helios facility in Dickens County, Texas during periods of high electricity prices" and was replacing the Company's Chief Technology Officer ("CTO").

13.     On this news, Argo's ADS price fell $0.27 per ADS, or 10.98%, to close at $2.19 per ADS on October 11, 2022.

14.     As of the time this Complaint was filed, Argo's ADSs continue to trade below the $15 per ADS Offering price, damaging investors.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15

U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and subsequent damages took place in this Judicial District.  Pursuant to Argo's most recent annual report on Form 20-F, as of December 31, 2021, there were 468,082,335 of the Company's ordinary shares outstanding.  Argo's ADSs, each representing ten of the Company's ordinary shares, trade on the Nasdaq Stock Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in Argo's ADSs located in the U.S., some of whom undoubtedly reside in this Judicial District.

19.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

20.     Plaintiff, as set forth in the attached Certification, purchased or otherwise acquired Argo ADSs pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and/or Argo securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

21.     Defendant Argo is organized under the laws of England and Wales with principal executive offices located at 9th Floor, 16 Great Queen Street, London WC2B 5DG, England.  The Company's ADSs and 8.75% Senior Notes due 2026 trade in an efficient market on the NASDAQ under the ticker symbols "ARBK" and "ARBKL", respectively.

22.     Defendant Peter Wall ("Wall") has served as Argo's Chief Executive Officer and a Member of the Company's Board of Directors (the "Board") at all relevant times.  Wall signed or authorized the signing of the Registration Statement filed with the SEC.

23.     Defendant Alex Appleton ("Appleton") has served as Argo's Chief Financial Officer and a Member of the Board at all relevant times.  Appleton signed or authorized the signing of the Registration Statement filed with the SEC.

24.     Defendants Wall and Appleton are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

25.     The Exchange Act Individual Defendants possessed the power and authority to control the contents of Argo's SEC filings, press releases, and other market communications.  The Exchange Act Individual Defendants were provided with copies of Argo's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Argo, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

26.     Argo and the Exchange Act Individual Defendants are sometimes referred to herein collectively as the "Exchange Act Defendants."

27.     Defendant Matthew Shaw ("Shaw") has served as a Member of the Board at all relevant times.  Shaw signed or authorized the signing of the Registration Statement filed with the SEC.

28.     Defendant Sarah Gow ("Gow") has served as a Member of the Board at all relevant times.  Gow signed or authorized the signing of the Registration Statement filed with the SEC.

29.     Defendant Colleen Sullivan ("Sullivan") served as a Member of the Board at the time of the IPO.  Sullivan signed or authorized the signing of the Registration Statement filed with the SEC.

30.     Defendant Maria Perrella ("Perrella") has served as a Member of the Board at all relevant times.  Perrella signed or authorized the signing of the Registration Statement filed with the SEC.

31.     The Exchange Act Individual Defendants and Defendants Shaw, Gow, Sullivan, and Perrella are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

32.     As directors, executive officers, and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Argo ADSs in the IPO for their own benefit and the benefit of the Company.  The Securities Act Individual Defendants were key members of the IPO working group and executives of the Company who pitched investors to purchase the shares sold in the IPO.

33.     Argo and the Securities Act Individual Defendants are sometimes referred to herein collectively as the "Securities Act Defendants."

34.     The Exchange Act Defendants and the Securities Act Defendants are sometimes collectively, in whole or in part, referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

35.     Argo, together with its subsidiaries, purports to engage in the cryptocurrency mining business worldwide, including the mining of BTC.

36.     Argo maintains a fleet of thousands of BTC mining machines located in the Company's Baie Comeau and Mirabel facilities in Canada, as well as its Helios facility located in Dickens County, Texas.

37.     On August 19, 2021, Argo filed the Registration Statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on September 22, 2021.

38.     On September 23, 2021, Argo filed the Prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

39.     On or about September 23, 2021, pursuant to the Offering Documents, Argo conducted the IPO, issuing 7.5 million ADSs to the public at the Offering price of $15 per ADS for approximate proceeds of $105 million to the Company before expenses and after applicable underwriting discounts and commissions.

### Materially False and Misleading Statements Issued in the Offering Documents

40.     The Offering Documents represented that Argo's mining strategy purportedly involves "***cost-effectively*** acquir[ing] the latest generation mining machines and install[ing] them in North American facilities that ***utilize predominantly . . . inexpensive power***" (emphases added).

41.     For example, the Offering Documents touted Argo's commitment to investing in reliable, low-cost power, stating, in relevant part:

> ***Reliable, Low-Cost, Renewable Power.*** We believe the combination of increased mining difficulty, driven by greater hash rates, and the periodic adjustment of reward rates, such as the halving of Bitcoin rewards, will drive the increasing importance of power efficiency in cryptocurrency mining over the long term. As a result, we are focused on deploying our mining machines at locations with access to reliable, renewable power sources, as successfully doing so should enable us to reduce our power costs.

(Emphasis in original.)

42.     The Offering Documents also stressed to investors the sustainability of Argo's operations through the use of the Company's "Smart Growth" strategy, which purportedly involves "optimiz[ing] our mining by identifying and purchasing the most profitable mining machines with industry-leading returns on investment and actively monitoring and adjusting the operation of those machines to enhance their performance", and that Defendants "believe this smart-growth strategy, including our commitment to mining efficiency and return on investment in mining machines, will enable us to build value over the long term."

43.     Likewise, the Offering Documents touted Argo's "fleet of more than 21,000 machines mining Bitcoin and other cryptocurrencies [that] can generate more than 1,075 petahash[1] per second," and that, "[a]s of June 30, 2021, our total hashrate places us in the top 10 of publicly listed self-miners that report such data."

44.     The Offering Documents also stated that "we recently acquired 160 acres of land in western Texas with access to up to 800 MW of power where we are currently developing a mining facility"—*i.e.*, the Helios facility—that "is expected to support 100 MW of power capacity

---

[1] A petahash is a unit used to measure the computing power of bitcoin miners.

in the first half of 2022 as part of Phase 1 of development and an additional 100 MW of power

capacity upon completion of Phase 2 of development."

45.     Moreover, the Offering Documents assured investors that Argo's "investments in

mining facilities are designed to significantly expand our mining capacity and provide us with

meaningful control over our mining operations."

46.     In addition, the Offering Documents made positive statements regarding the

historical sustainability of Argo's operations, the attractiveness of its purported "appreciating"

investments in BTC, and the Company's ability to fund its operating expenses while retaining

meaningful growth, stating, in relevant part:

> Since inception, we have mined more than 4,515 Bitcoin and Bitcoin Equivalent
> for our own account through June 30, 2021. While we mine for cryptocurrency for
> sale in the ordinary course of business, we believe that cryptocurrency represents
> an attractive, appreciating investment opportunity, and as such we have historically
> held cryptocurrency assets that we do not otherwise sell to fund our operating
> expenses. On June 30, 2021, we held 1,268 Bitcoin and Bitcoin Equivalent valued
> at approximately £31,896,437 based on prices as of such date. Our total revenue
> was £31,085,716 in the six months ended June 30, 2021, representing a growth rate
> of 179% over £11,124,455 in the six months ended June 30, 2020. We generated
> net income of £7,213,997 and £523,074 in the six months ended June 30, 2021 and
> in 2020, respectively, and a net loss of £869,051 in 2019. We generated EBITDA
> of £15,979,822, £7,625,309 and £1,387,386 in the six months ended June 30, 2021,
> in 2020 and in 2019, respectively.

47.     The statements referenced in ¶¶ 40-46 were materially false and misleading because

the Offering Documents were negligently prepared and, as a result, contained untrue statements of

material fact or omitted to state other facts necessary to make the statements made not misleading

and were not prepared in accordance with the rules and regulations governing their preparation.

Specifically, the Offering Documents made false and/or misleading statements and/or failed to

disclose that: (i) Argo was highly susceptible to and/or suffered from significant capital

constraints, electricity and other costs, and network difficulties; (ii) the foregoing issues hampered,

*inter alia*, Argo's ability to mine BTC, execute its business strategy, meet its obligations, and operate its Helios facility; (iii) as a result, Argo's business was less sustainable than Defendants had led investors to believe; (iv) accordingly, Argo's business and financial prospects were overstated; and (v) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

### Materially False and Misleading Statements Issued During the Class Period

48.     The Class Period begins on September 23, 2021, when Argo's ADSs began publicly trading on the NASDAQ pursuant to the materially false or misleading statements or omissions contained in the Offering Documents, as referenced in ¶¶ 40-46, *supra*.

49.     On September 30, 2021, Argo issued a press release announcing that it had expanded the mining capacity of its future Helios facility through a purchase agreement for cryptocurrency mining machines that was partially funded by the Company's cash reserves, stating, in relevant part:

> Argo . . . is pleased to announce that it has executed a purchase agreement for 20,000 Bitmain Antminer S19J Pro machines, to be paid in periodic installments before final shipment. The initial deposit is currently being funded by the Company's cash reserves. The machines are expected to increase Argo's hashrate by over 2 Exahash and are expected to be delivered and installed at the Company's future Texas facility in monthly batches from Q2 2022 through Q3 2022. Based on existing capacity and previous orders, Argo's mining capacity is expected to be 1.7 Exahash by mid-Q4 2021. This expansion will bring the Company's total mining capacity to 3.7 Exahash by the end of Q3 2022.

50.     On November 1, 2021, Argo issued a press release announcing its third quarter 2021 results (the "3Q21 Press Release"). That press release assured investors regarding the continued sustainable growth of the Company's BTC mining operations, stating, in relevant part:

> "From breaking ground on our sustainable cryptocurrency mining facility in Dickens County, Texas to our public listing on Nasdaq in the United States, this quarter has been pivotal as Argo continues to scale," stated [Defendant] Wall, Chief Executive Officer of Argo Blockchain. "I am proud of the growth we experienced

during the quarter and believe Argo is strategically positioned to continue this momentum as we build out our Helios facility in Texas."

\* \* \*

During the third quarter, Argo mined 597 [BTC], bringing Argo's BTC holding to 1,836 as of September 30, 2021. Argo has been able to achieve these results while maintaining a gross margin of 120% and an industry-leading mining margin of 85% with an average direct cost per BTC mined of $6,293 (£4,673).

51.    The 3Q21 Press Release also stated that "[t]he new Helios facility will bolster Argo's mining capacity" and "gives Argo access to up to 800 MW of electrical power[.]"

52.    On April 27, 2022, Argo issued a press release announcing its full year 2021 results (the "FY21 Press Release").  With respect to the Company's operational highlights, the FY21 Press Release stated, in relevant part, that Argo had "[a]cquired the Helios project in Dickens County, Texas, which has an interconnection agreement for up to 800MW of power capacity"; that Argo "[a]cquired two data centres in Quebec (Mirabel and Baie Comeau) . . . with a combined total of 20MW of power capacity"; that Argo "[p]urchased 20,000 Bitmain S19J Pro mining machines with delivery and installation expected to occur in batches from May to October 2022"; and that Argo "[e]xpanded Bitcoin mining capacity from 0.6 Exahash per second ('EH/s') to 1.6 EH/s"; all of which indicated that the Company had significantly strengthened its BTC mining operations.

53.    The FY21 Press Release also provided the following financing highlights:

- In Q1, raised £49.2 million [$66.4 million] in new equity via private placement for investment in mining rigs, Texas development, blockchain/fintech ventures including a significant equity investment in Pluto Digital Assets plc, and working capital

- In Q3, raised £94.8 million [$127.9 million] in new equity via a public offering on the Nasdaq Global Select Market, which significantly expanded our investor reach by expanding access to the US capital markets

- In Q4, raised £29.6 million [$40.0 million] in unsecured debt through the issuance of senior notes traded on the Nasdaq Global Select Market

(Alterations in original.)  These statements indicated that the Company had not only significantly strengthened its capital resources, but also had sufficient capital to meet existing debt obligations in addition to the new debt obligations it had entered into.

54.    In addition, the FY21 Press Release quoted Defendant Wall, who stated, in relevant part, that "Argo . . . accomplished key milestones to strengthen the foundation of the Group and position us for long-term success through the acquisition of the Helios project and our dual listing on Nasdaq"; that "[t]he acquisition of Helios provided us with the opportunity to build a best-in-class, vertically-integrated facility with access to *low-cost* and sustainable electricity, which is unmatched by our peers" (emphasis added); and that "[w]ith our mining operations at Helios expected to commence in May, along with the development of custom mining machines using Intel's next-generation Blockscale ASIC chips, Argo is well-positioned to continue its growth with a focus on delivering for our shareholders."

55.    On May 2, 2022, Argo filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K").  With respect to Argo's purportedly "cost-effective[]" and "inexpensive[ly] power[ed]" BTC mining operations and facilities, including the Helios facility, the 2021 10-K stated, in relevant part:

> Our mining strategy is to ***cost-effectively*** acquire and deploy the most advanced mining technology solutions in North American facilities that ***utilize predominantly . . . inexpensive power***. As of December 31, 2021, we had a fleet of approximately 24,000 machines mining Bitcoin and other cryptocurrencies and can generate more than 1,605 petahash per second . . . . As of December 31, 2021, our total hashrate places us in the top 10 of publicly listed self-miners that report such data . . . . [W]e acquired 160 acres of land in western Texas with access to up to 800 MW of power where we are currently developing a mining facility ("Helios"). The Helios facility is expected to support 200 MW of power capacity, and mining operations are expected to commence in May 2022. Our investments in mining facilities are designed to significantly expand our mining capacity and provide us with meaningful control over our mining operations.

(Emphases added.)

56.     With respect to Argo's purported strategy to use reliable, low-cost power for its

mining operations, the 2021 10-K stated, in relevant part:

> By owning and operating our mining machines at facilities that offer competitive
> advantages, ***including access to reliable, low-cost, renewable power*** and room for
> expansion, we expect to have greater control over the timing of the purchase and
> deployment of our mining machines.
>
> * * *
>
> Power represents our highest variable direct cost for our mining operations, with
> electrical power required both to operate the mining machines and to dissipate the
> significant amount of heat generated by the machines' operation . . . . ***[W]e are***
> ***focused on deploying our mining machines at locations with access to reliable,***
> ***renewable power sources, as successfully doing so should enable us to reduce our***
> ***power costs*** . . . . [T]he Helios facility that we are currently building is located in
> the Texas Panhandle, where 85% of electricity generation capacity comes from
> wind power. At Helios, we anticipate that our net electricity costs will be below
> $0.02/kWh after including the benefits of participating in demand response
> programs offered by the Electric Reliability Council of Texas[.]

(Emphases added.)

57.     With respect to Argo's capital expenditures, the 2021 10-K stated, in relevant part:

> Historically, our capital expenditures have consisted primarily of purchasing
> mining machines and computer equipment and improvements to the mining
> facilities in which we operate. Our capital expenditures during the year ended
> December 31, 2020 were principally for purchasing mining machines. Beginning
> in 2021, in addition to the acquisition of mining machines, our capital expenditures
> have expanded to include acquiring and building mining facilities that we will own
> and operate. Our capital expenditures were £15.7 million, £9.2 million and £160.3
> million in 2019, 2020 and 2021, respectively. We expect significantly higher capital
> expenditures in the future, as we execute our strategy to own and operate our mining
> facilities.

58.     The 2021 10-K also continued to make positive statements regarding the historical

sustainability of Argo's operations, the attractiveness of its purported "appreciating" investments

in BTC, and the Company's ability to fund its operating expenses while retaining meaningful

growth, stating, in relevant part:

Since inception, we have mined more than 5,840 Bitcoin and Bitcoin Equivalent for our own account through December 31, 2021. While we mine for cryptocurrency for sale in the ordinary course of business, we believe that cryptocurrency represents an attractive, appreciating investment opportunity, and as such we have historically held cryptocurrency assets that we do not otherwise sell to fund our operating expenses. On December 31, 2021, we held 2,595 Bitcoin and Bitcoin Equivalent valued at approximately £88.8 million based on prices as of such date. Our total revenue was £74.2 million in the year ended December 31, 2021, representing a growth rate of 291% over £19 million in the year ended December 31, 2020. We generated net income of £30.8 million and £1.4 million in the year ended December 31, 2021 and December 31, 2020, respectively. We generated EBITDA of £52.9 million and £7.6 million in the year ended December 31, 2021 and December 31, 2020, respectively.

59.    Appended as an exhibit to the 2021 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Exchange Act Individual Defendants certified that the 2021 10-K "fully complies with the requirements of section 13(a) of the [Exchange Act] and information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of Argo."

60.    On May 5, 2022, Argo issued a press release announcing the "[e]nergization" and official opening of its Helios facility, stating, in relevant part:

Phase 1 of Helios' development will utilise 200 MW of power capacity and represents an increase of 243% in Argo's hashrate to an anticipated 5.5 EH/s by the end of 2022 as the Company significantly scales up its mining operations.

Helios also has access to up to an additional 600 MW of power capacity which the Company expects to utilise in the coming years through further phases of development at the site. It is anticipated this additional capacity, along with further development of the site, will enable Argo's operations to grow significantly to more than 20 EH/s.

Helios has been designed to house one of the largest immersion-cooled mining operations in the world, *which is expected to be more cost-efficient*, extend the life of the mining machines by reducing machine exposure to dust and debris and improve operational performance.

(Emphasis added.)

61.     On May 18, 2022, Argo issued a press release announcing its first quarter 2022 results.  That press release quoted Defendant Wall, who stated, in relevant part:

> To be a successful miner you need three components - power, miners, and capital. We already have a strong foundation for growth at Helios with our access to 800 MW of power capacity. This quarter, *we improved our access to capital* by establishing a financing relationship with NYDIG and strengthened our access to miners through our supply agreement with Intel for their new Blockscale ASIC chips. This will allow us to build custom-designed mining machines specifically to Argo's specifications and built for use in immersion-cooling technology.

(Emphasis added.)

62.     The statements referenced in ¶¶ 48-61 were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that: (i) Argo was highly susceptible to and/or suffered from significant capital constraints, electricity and other costs, and network difficulties; (ii) the foregoing issues hampered, *inter alia*, Argo's ability to mine BTC, execute its business strategy, meet its obligations, and operate its Helios facility; (iii) as a result, Argo's business was less sustainable than Defendants had led investors to believe; (iv) accordingly, Argo's business and financial prospects were overstated; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

63.     On June 7, 2022, during pre-market hours, Argo issued a press release providing an operational update for May 2022, including that the Company had mined approximately 25% fewer BTC compared to April 2022 because of, *inter alia*, increased network difficulty, higher electricity prices, and the curtailment of mining operations at its Helios facility.  Specifically, that press release stated, in relevant part:

During the month of May, Argo mined 124 Bitcoin or Bitcoin Equivalents (together, BTC) compared to 166 BTC in April 2022. The reduction in BTC mined is attributable to several factors:

- The Bitcoin network experienced an increase in difficulty, leading to fewer BTC mined.

- The Company's hashrate on Terra Pool produced substantially lower Bitcoin than in previous months, primarily due to short-term probabilistic outcomes. The Company continues to explore all options to optimize its hashrate across alternative pools.

- High temperatures in Texas led to increased energy demand and higher electricity prices, to which the Company responded by voluntarily curtailing mining operations and reducing its energy usage at Helios.

- The Company faced some limited instances of unplanned downtime at Helios while bringing the new facility online.

64.     On this news, Argo's ADS price fell $0.28 per ADS, or 4.4%, to close at $6.09 per ADS on June 7, 2022.  Despite this decline in the Company's ADS price, Argo securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of the Exchange Act Defendants' continued misstatements and omissions regarding the sustainability of the Company's BTC mining operations and business and financial prospects.

65.     For example, on August 24, 2022, Argo issued a press release announcing its interim half year 2022 results (the "2Q22 Press Release").  With respect to the Company's capital, the 2Q22 Press Release reassured investors, in relevant part, that "[d]espite the overall market drawdown and the decrease in Bitcoin price, the Group has been able to raise significant capital via secured debt financing."

66.     The 2Q22 Press Release also contained an "Outlook" statement from Defendant Wall, stating, in relevant part, that "[a]s operations at Helios continue to ramp up, there are certain milestones which will enable us to optimise our operations and achieve greater efficiency", including "several opportunities to execute a long-term, fixed price power purchase agreement

(PPA), which will lock in our electricity prices and reduce our exposure to short term price fluctuations"; and that "Argo is well positioned to weather the current downturn with its large and highly efficient mining infrastructure, runway for growth, and experienced management team, which has successfully navigated the Group through previous crypto winters."

67.     The statements referenced in ¶¶ 65-66 were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that: (i) Argo was highly susceptible to and/or suffered from significant capital constraints, electricity and other costs, and network difficulties; (ii) the foregoing issues hampered, *inter alia*, Argo's ability to mine BTC, execute its business strategy, meet its obligations, and operate its Helios facility; (iii) as a result, Argo's business was less sustainable than Defendants had led investors to believe; (iv) accordingly, Argo's business and financial prospects were overstated; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Fully Emerges

68.     On October 7, 2022, during pre-market hours, Argo issued a press release "announc[ing] several strategic actions that are intended to bring in additional capital to the business and ensure that the Company has the working capital necessary to execute its current strategy and meet its obligations over the next twelve months."  Argo stated that in addition to measures being undertaken to reduce costs and preserve capital, Argo had signed a non-binding letter of intent with an affiliate of NYDIG to amend an existing equipment financing agreement, plans to sell 3,400 mining machines for cash proceeds of £6 million, and intends to raise approximately £24 million via a proposed subscription with a strategic investor.

69.     With specific respect to Argo's non-binding letter of intent with the NYDIG

affiliate, the October 7, 2022 press release stated, in relevant part:

> The Company has executed a non-binding letter of intent ("NYDIG LOI") to amend its existing equipment financing agreement with an affiliate of [NYDIG]. This amendment releases approximately £5.0 million ($5.7 million) of restricted cash and modifies the amortisation schedule for the Company's existing loans. The transaction significantly reduces the Company's debt service payments and links future payments for NYDIG loans used to finance purchases of digital asset mining equipment to network mining profitability. In exchange, the Company will provide NYDIG with an expanded collateral package. The amended equipment financing agreement is expected to contain customary covenants for an agreement of its type. The Company and NYDIG expect to close the amendment within the next few weeks, and a further announcement will be made in due course.

70.     With respect to Argo's plans to sell 3,400 mining machines, the October 7, 2022

press release stated, in relevant part:

> [T]he Company has signed an agreement to sell to a third party 3,400 new in box Bitmain S19J Pro machines, representing ~340 PH/s of total hashrate capacity, for cash proceeds of £6.0 million ($6.8 million). Argo will host these machines for the third party at Helios pursuant to a hosting services agreement that includes a profit sharing arrangement.
>
> After accounting for this sale, the Company expects to achieve a total hashrate capacity of 2.9 EH/s by the end of October 2022.

71.     With respect to Argo's proposed subscription with a strategic investor, the October

7, 2022 press release stated, in relevant part:

> The Company has entered into a non-binding letter of intent with a strategic investor ("Investor") under which, subject to contract, due diligence and other customary conditions, the Investor has agreed to subscribe for approximately 87 million Ordinary Shares at GBP £0.276 per Ordinary Share for gross proceeds of approximately GBP £24 million ($27 million) (the "Subscription").
>
> * * *
>
> Assuming completion of the Subscription, the Investor will hold 15.46% of the Company's enlarged issued share capital.
>
> The Investor will have the right to nominate two new non-executive directors to the Board, subject to the Company's approval. One of these new non-executive

directors will replace an existing non-executive director. Following these appointments, the Board will consist of seven directors.

* * *

The Company and Investor expect to complete the Subscription within the next 30 days, and a further announcement will be made in due course.

72.     Following the disclosures in the October 7, 2022 press release, Argo's ADS price

fell $0.97 per ADS, or 23.26%, to close at $3.20 per ADS on October 7, 2022.

73.     Then, on October 11, 2022, during pre-market hours, Argo issued a press release

providing an operational update, stating, in relevant part:

> During the month of September, Argo mined 215 [BTC] compared to 235 BTC in August 2022. The decrease in BTC mined is primarily due to a 12% increase in average network difficulty during September. Additionally, the Company is continuing to curtail operations at its Helios facility in Dickens County, Texas during periods of high electricity prices.

* * *

**Organisational Changes**

> Effective October 15, Perry Hothi is stepping down from his role as [CTO] at Argo and will serve as a transitional advisor to the Company. The technology function will be led by Jean Esquier, who currently serves as Vice President of Technology and Development.

74.     On this news, Argo's ADS price fell $0.27 per ADS, or 10.98%, to close at $2.19

per ADS on October 11, 2022.

75.     As of the time this Complaint was filed, Argo's ADSs continue to trade below the

$15 per ADS Offering price, damaging investors.

76.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's securities, Plaintiff and other Class members have suffered

significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Argo ADSs pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and/or Argo securities during the Class Period; and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

78.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Argo securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Argo or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

81.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of Argo;

- whether the Securities Act Individual Defendants negligently prepared the Offering Documents for the IPO and, as a result, the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- whether the Exchange Act Individual Defendants caused Argo to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Argo securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

83.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Argo securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Argo securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

84.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

85.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)**

86.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

87.     This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

88.     During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Argo securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Argo securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

89.     Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Argo securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Argo's finances and business prospects.

90.     By virtue of their positions at Argo, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative,

the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.  Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

91.    Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.  As the senior managers and/or directors of Argo, the Exchange Act Individual Defendants had knowledge of the details of Argo's internal affairs.

92.    The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Argo.  As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Argo's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Argo securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Argo's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Argo securities at artificially inflated prices and relied upon the price of the

securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

93.     During the Class Period, Argo securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Argo securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Argo securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Argo securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

94.     By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

95.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)**

96.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

97.     During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Argo, and conducted and participated, directly and indirectly, in the conduct of Argo's business affairs.  Because of their senior positions, they knew the adverse non-public information about Argo's misstatement of income and expenses and false financial statements.

98.     As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Argo's financial condition and results of operations, and to correct promptly any public statements issued by Argo which had become materially false or misleading.

99.     Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Argo disseminated in the marketplace during the Class Period concerning Argo's results of operations.   Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Argo to engage in the wrongful acts complained of herein.  The Exchange Act Individual Defendants, therefore, were "controlling persons" of Argo within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Argo securities.

100.     Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Argo.  By reason of their senior management positions and/or being directors of Argo, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Argo to engage in the unlawful acts and conduct complained of herein. Each of the Exchange Act Individual Defendants exercised control over the general operations of Argo and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

101.     By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Argo.

## COUNT III

**(Violations of Section 11 of the Securities Act Against the Securities Act Defendants)**

102.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

103.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

104.     The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

105.     Argo is the registrant for the IPO.  Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

106.     As issuer of the shares, Argo is strictly liable to Plaintiff and the Class for the misstatements and omissions in the Offering Documents.

107.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

108.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

109.     Plaintiff acquired Argo shares pursuant and/or traceable to the Offering Documents for the IPO.

110.     Plaintiff and the Class have sustained damages.  The value of Argo ADSs has declined substantially subsequent to and because of Defendants' violations.

### COUNT IV

**(Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)**

111.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

112.     This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

113.     The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Argo within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and influence and exercised the same to cause Argo to engage in the acts described herein.

114.     The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

115.     By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  January 26, 2023

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff*

DocuSign Envelope ID: 34A16BDF-6957-42A8-B73B-0CDC1895A12F

# CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, <u>AARON MURPHY</u>, make this declaration pursuant to

Section 27(a)(2) of the Securities Act of 1933 (the "Securities Act") and/or Section 21D(a)(2) of the

Securities Exchange Act of 1934 (the "Exchange Act") as amended by the Private Securities Litigation

Reform Act of 1995.

2.      I have reviewed a Complaint against Argo Blockchain plc ("Argo" or the "Company") and

authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Argo securities at the direction of plaintiffs' counsel or in

order to participate in any private action arising under the Securities Act or the Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired Argo ADSs pursuant and/or traceable to the Offering Documents issued

in connection with the IPO as specified in the Complaint, and/or Argo securities during the Class Period as

specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand

that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Argo ADSs pursuant and/or traceable to

the Offering Documents issued in connection with the IPO as specified in the Complaint, as well as Argo

securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have

not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the

class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs

and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.


**Executed** _10/24/2022_____
                    **(Date)**

                                    DocuSigned by:

                                    *Aaron Murphy*

                    _____
                                    **(Signature)**
                                    F825AC0D01B244C...


                    _Aaron Murphy_____
                            **(Type or Print Name)**

**Argo Blockchain plc (ARBK)**                                                      **Aaron Murphy**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 4/6/2022 | 40 | $9.6100 |
| Purchase | 4/14/2022 | 50 | $8.9500 |
| Purchase | 6/15/2022 | 110 | $4.0000 |
| Purchase | 10/10/2022 | 75 | $2.8400 |